Filed 1/13/14  P. v. Jones CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>SHANNON NICOLE JONES,<br><br>  Defendant and Appellant. | B248463<br><br>(Los Angeles County<br>Super. Ct. No. VA125194) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed.

Thomas K. Macomber, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Shannon Nicole Jones, appeals from the judgment entered following her pleas of no contest to three counts of the serious (Pen. Code, § 1192.7, subd. (c))[1] and violent (§ 667.5, subd. (c)) felony of second degree robbery (§ 211) and her admission that, during the commission of the offenses, she personally used a firearm (§ 12022.53, subd. (b)).  The trial court sentenced Jones to 17 years in state prison.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.[2]

On April 21, 2012, Maria Valencia was working as a sales representative in the Verizon store on Telegraph Road in Santa Fe Springs.  At approximately 4:30 that afternoon, a number of employees and one customer were in the store. Valencia, who was working at her desk, then saw two individuals wearing masks and carrying guns walk into the store.  The individual who first entered, an African-American man, pointed his pistol "[at] everyone" and shouted at them, telling them to "hit the deck."  After Valencia got down on the floor behind her desk, she briefly saw the second masked person who had entered the store and realized, as the individual began to speak, that it was an African-American woman.

While the woman went to the other side of the store, the masked man asked Valencia if anyone was in the back room.  Valencia was too frightened to say anything, so the store manager stated there were two people in the back.  A third intruder then went to the door to the back room, punched in the entrance code and opened the door.

After she had been on the floor for approximately three minutes, another employee, Marlon Anderson, indicated the intruders had left the store.  Valencia attempted to get up but was so disturbed by the experience that she had difficulty breathing, was shaking and could not walk.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The facts have been taken from the transcript of the preliminary hearing.

David McNeil, a "business retail sales consultant" at the Santa Fe Springs Verizon store, was also working on the afternoon of April 21, 2012. McNeil remembered seeing three armed individuals, each of which was wearing a mask, a hooded jacket and latex gloves, enter through the front door of the store. As the three talked, McNeil realized that one of the intruders was a woman and that she was pointing a gun in his direction. Although the woman told him to get back into the store, because he was halfway out the exit door which led to the back room, McNeil kept moving, ran through the back room and out the door which led to the back parking lot. As he was running through, McNeil heard someone open the "security door" which leads from the front of the store to the back room.

In the parking lot, approximately 21 feet from the back door, McNeil saw a parked car, with its engine running and a slender, African-American individual sitting in the driver's seat. McNeil briefly glanced at the car, which was a newer model black or blue station wagon.

On April 21, 2012, John Moreno was working with four other employees, including Anderson. Moreno remembered that at approximately 4:20 p.m. that day, he was at the copy machine by the back "security door." When a man with a gun and wearing a mask over his face entered the store and told everyone to " 'get down,' " Moreno, in the "split . . . second [he] was by the door by the copier[,] . . . opened the door and left." Another employee, McNeil, was just behind Moreno and Moreno "pulled [McNeil] out of the back door."

As the two men ran out the door, Moreno noticed a dark-colored, small, compact car with an African-American man seated in the driver's seat parked to his left. Moreno and McNeil continued to run until they reached a nearby gas station. There, the attendant gave Moreno a phone on which he called 911. As he was making the call, Moreno saw the car from the back of the store drive down the street. He made eye contact with the driver for "one-tenth of a second." As the car windows were tinted and had been rolled up, Moreno could not see if there was anyone else in the car. McNeil, too, saw the

station wagon being driven out of the parking lot, onto the street toward the 605 Freeway. As the car drove away, McNeil saw a passenger toss a latex glove out the window.

Dannia Romo was working at the Santa Fe Springs Verizon store on April 21, 2012 with several other employees, including an individual later determined to be a defendant, Marlon Anderson. Just before the store was going to close, two African-American individuals, a man and a woman with their faces covered by turquoise handkerchiefs and their heads covered by dark hoods, entered the store, pointed guns at everyone in the store and told them to get down onto the floor. Romo laid on the floor for approximately five minutes, until one of the store employees indicated the intruders had left. She then got up and, although she was quite shaken, attempted to comfort the other employees. Anderson, who also appeared to be "shaken up," hugged Romo.

City of Whittier Police Department Detective Jose Bolanos responded to the 911 call directing him to the Santa Fe Springs Verizon store. The call indicated a "take-over robbery" had just occurred there. When he arrived, Bolanos spoke with a store employee, Lynn McCleandan, who told the detective that two men and a woman, all wearing face masks and carrying guns, had entered the store and told everyone in the store to get down on the ground. One of the individuals then went to the door of the storage room where the merchandise is kept, entered the code number and went inside. When McCleandan later went into the storage room, it looked as though it had been "ransacked."

Bolanos viewed the store's surveillance tape, which showed the parking lot behind the store. The detective saw on the tape a "black Dodge Magnum with after-market black five-spoke rims with a chrome lip[,] a mesh grille" and tinted windows.

Debra Stewart is the manager of the Santa Fe Springs Verizon store. After the robbery, she received a telephone call and went to the store, arriving at a little after 5:00 p.m. When she walked into the store, Stewart saw a number of police officers and her employees, many of whom were quite distraught.

As the robbery occurred on Saturday evening and the store is not open on Sunday, the following Monday Stewart took inventory of all the IPhones, Tablets and other items

4

which had been taken from the store. Based on her list of inventory, Stewart was able to compile a list of the serial numbers of each of the items which had been stolen.

Stewart was again called to the store on the morning of Saturday, June 2, 2012, because the store had been burglarized the night before.[3] Stewart inspected the doors, windows, hinges and locks and found nothing had been broken. However the surveillance tape of the front of the store showed a "person [running into the store] through the front door" at approximately 11:40 p.m. The tape from inside the store showed the person jump over the counter, open the door to the back room then go to the cabinet which contained all the cell phones and place the phones in a black trash bag. In the meantime, the surveillance camera from the front of the store showed an individual bending down while keeping the front door "cracked" open. An inventory of the store merchandise after the burglary indicated that approximately $20,000 worth of phones and other electronics had been taken. Once again, Stewart was able to obtain the serial numbers for each of the stolen items, which she turned over to one of the police officers investigating the matter, Whittier Police Department Detective Ryan Todd.

Stewart indicated that an individual, Marlon Anderson, was the employee who had been assigned to close and lock up the store on the night of June 1st. Anderson would, accordingly, have had custody of the key for the weekend and was supposed to give it to a designated employee the following Monday morning.

Stewart decided to review the surveillance tapes from April 21st. She noted that, immediately before the robbery, Anderson, in violation of store rules, had been texting someone "on his personal cell phone [while he was] on the sales floor."

Detective Todd and his partner, Detective Robert Wolfe, work in the Santa Fe Springs Investigation Division. The two detectives were assigned to investigate the April 21st Verizon store robbery. Todd had met Anderson when, on June 6, 2012, the detective went to Anderson's Anaheim home to execute a search warrant. In a bedroom

---

[3]     After the April 21st robbery, the store changed its schedule and no longer opened on Saturdays or Sundays.

at the house, police officers recovered, among other items, an IPhone, over $1,000 in United States currency, credit card profiles of various individuals and two bronze metal keys which resembled keys to the Verizon store. After the search warrant had been executed, Anderson was taken into custody, transported to the police station and, after having been advised of his *Miranda*[4] rights, interviewed.

Anderson agreed to speak with Detectives Todd and Wolfe about the April 21st robbery and the June 1st burglary. He indicated he had been approached by his cousin, Shannon Jones, who wanted to know if he wished to make some money by participating in a robbery of the Verizon store. On the day before the robbery, Jones and a cohort went to the store and observed an employee enter the code on the security pad to the back room. The code was then confirmed by Anderson. On the day of the robbery, Anderson was in constant contact with Jones via text messaging and, immediately before the robbery, Anderson texted Jones to let her know how many employees and customers were in the store.

With regard to the June 1st burglary, Anderson indicated he unlocked the door to the store, then waited outside while his accomplices went inside and took the merchandise. After the robbery and burglary, Anderson sold the merchandise to a number of individuals. Anderson kept approximately $1,500 of the proceeds from the sales, then distributed the rest of the money to the other individuals who had participated in the robbery and burglary.

After interviewing Anderson, the detectives questioned Jones. Before speaking with her, the detectives searched Jones and recovered from her pocket a cell phone which had been taken from the Verizon store during the April 21st robbery. The detectives identified the phone by comparing its serial number to the list of serial numbers of stolen phones provided by Stewart.

Detective Todd read to Jones her *Miranda* rights and she agreed to make a statement. Jones began by expressing her remorse and admitting she had been involved

---

**4**      *Miranda v. Arizona* (1966) 384 U.S. 436.

6

in the burglary. Jones stated she had been approached by her cousin, Anderson, who asked her if she wished to participate in the burglary of the store. Jones agreed and drove Anderson and another individual to the Verizon store. While she waited in the car, Anderson opened the door and the third individual entered the store, "grabbed the product," then ran back to the car with Anderson. Jones then drove the three of them "away." With regard to the April 21st robbery, Jones indicated she had known about it and knew the individuals involved, but had not participated in it.

The following day, on June 7, 2012, Detective Wolfe conducted a tape recorded interview of Jones. After Wolfe reminded Jones of her *Miranda* rights, she agreed to speak with him again. Jones again told Wolfe she was "remorseful," then indicated she had been involved in the April 21st robbery. Jones stated that, after communicating several times with Anderson, they contacted an individual from which they rented guns for $250. After making certain the guns were not loaded, she and three other individuals went to the Verizon store.

Once she was inside the store, Jones ran to the back and "grabbed all the phones [from] the inventory shelves." She and her two cohorts then ran out the back door to a car waiting for them. Jones indicated her share of the proceeds from the merchandise taken from the robbery was $1,400.

At approximately noon on June 11, 2012, Todd and Wolfe interviewed a man by the name of Anthony Brown. Brown, who was interviewed at the Whittier Police station, was advised of his *Miranda* rights then told the detectives that, although he had heard about the robbery of the Verizon store, he had not been a participant. He later, however, changed his story and stated he had been approached by Jones with regard to the April 21st robbery. He had agreed to participate in the robbery and stated that, when they arrived at the store, Jones "and [another] individual were the ones with the firearms and he was the one who ran to the back of the store and grabbed the phones." The merchandise was later given to Anderson.

After viewing the surveillance tape from the back of the Verizon store, on June 13, 2012 Todd and his partner went to an address on East 4th Street in Long Beach and spoke

7

with a man named Isaiah Baul. Parked in front of the address was "a black Dodge Magnum with after-market rims and tinted windows that matched to a T the vehicle in the robbery video." After the detectives searched the car and found one of the stolen Galaxy Tablets, Baul, who was the registered owner of the vehicle, was taken into custody and interviewed. After waiving his *Miranda* rights, Baul at first denied any involvement in the April 21st robbery. He then admitted that, on that day he had driven Jones and another individual to the Verizon store, dropped them off, then pulled around to the back of the store where he picked up Jones and two other persons. While he was waiting for Jones and her cohorts, Baul had seen two store employees run out the back of the store.

After Jones and the others got into the car, Baul drove them to a residence in Long Beach. There, "the property [taken from the store] was gone over." Baul indicated he was supposed to receive payment for his participation in the robbery. However, as of the time of the interview, he had received nothing. He claimed the Galaxy Tablet found in his car belonged to a friend.

2. *Procedural history*.

In an information filed August 17, 2012, Jones and a number of codefendants were charged with five counts of the serious (§ 1192.7, subd. (c)) and violent (§ 667.5, subd. (c)) felony of second degree robbery (§ 211) (counts 1 to 5). As to Jones, it was further alleged that during the commission of the robberies a principal was armed with a firearm, a handgun (§ 12022, subd. (a)(1)), and she personally used a handgun (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). In the same information, Jones and a codefendant were charged with second degree commercial burglary (§ 459) (count 7) and grand theft of personal property (§ 487, subd. (a)) (count 8). With regard to Jones it was also alleged as to counts 1, 2, 3, 4, 5, 7 and 8 that an executed sentence imposed for any of the alleged felonies would be served in state prison (§ 1170, subd. (h)(3)) and that Jones would be subject to the provisions of the Three Strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)) as she had suffered a 2002 conviction for robbery (§ 211).

8

At proceedings held on August 17, 2012, Jones waived arraignment, a reading of the information and advisement of her constitutional and statutory rights, then entered pleas of not guilty to each of the counts and denied all the remaining allegations.

On February 26, 2013, Jones joined her codefendant Brown in a motion to dismiss pursuant to section 995 the allegations made with regard to her use of a firearm during the robberies. However, as to her use of a firearm, the trial court indicated that based on its review of the motion and the transcript of the preliminary hearing, it could not find that "the magistrate was inappropriate or inaccurate in her decision to hold defendants Brown and Jones to answer . . . ." Accordingly, the trial court denied the section 995 motion.

For purposes of the motion to suppress evidence brought pursuant to section 1538.5 by Jones's codefendant Baul, Detective Wolfe testified that as part of his investigation of the robberies and burglary at the Verizon store he had obtained a search warrant for Anderson's cell phone. Wolfe discovered several text messages from Anderson's phone to another cell phone made before and after the robbery. Before the robbery, Anderson sent text messages indicating who was in the store and when to enter the store. After the robbery there was a text message regarding what merchandise had been taken and one regarding payment for two of the participants. It was later determined the texts had been sent to a cell phone owned by a man and a woman who lived on Esther Street in Long Beach. In view of the text messages found on his phone, Wolfe obtained a search warrant for Anderson's Anaheim apartment and arrangements were made for surveillance of the Esther Street residence in Long Beach. On the night before the search warrant for Anderson's apartment was executed, police officers followed Anderson after he left the Verizon store. He went to the Esther Street residence, where he stayed for a "brief time" before going to his apartment. The following day, as Anderson's apartment was being searched, Anderson's girlfriend, out of the presence of Anderson, mentioned the name "Shannon Jones."

Wolfe then went to Anaheim and was present when Jones and two other individuals were found in a car which had been stopped by police officers after driving

9

away from the Esther Street residence. When Jones, who had been riding in the front passenger seat, got out of the car, she placed a cell phone on the roof of the vehicle. Wolfe took custody of the phone and, by checking the serial number, determined it had been one of the phones taken from the Verizon store. Wolfe then spoke with Jones, who had been handcuffed and was standing on the sidewalk. Wolfe later interviewed Jones and, after having been advised of her *Miranda* rights, Jones told the detective she had been involved in the robbery and the burglary of the Verizon store.

In the meantime, Anderson had been transported to the station where Wolfe interviewed him later that day. During the interview, Anderson indicated he "was pretty much the mastermind behind the robbery and that he had set it up." Anderson stated Jones was one of the individuals involved and that she had been carrying a gun.

As part of his investigation, Wolfe had gone to the house on Esther Street and obtained written consent from one of the residents, a Ms. Jefferson, to search the house. Wolfe indicated he had not obtained a warrant to search the residence because time was of the essence: there were a lot of people, including Jones, coming and going from the house. When Wolfe arrived at the residence, he told Jefferson the police were conducting an investigation regarding Jones, whom they believed had been involved in an incident. Wolfe then told Jefferson that if she would not consent to a search of the house by officers, Wolfe would "contain[]" the residence, which would prevent anyone from going into or leaving the house, while he obtained a search warrant. Jefferson, who Wolfe described as "extremely cooperative," told Wolfe that, although Jones had been "kicked out of the house," the officers were free to search it. Inside the house, from on top of a dresser, Wolfe recovered an IPhone, the serial number of which matched that of one taken from the Verizon store.

After receiving an anonymous tip that Baul had been involved in the crimes committed at the Verizon store, Wolfe performed a search of Department of Motor Vehicle records and determined that the vehicle used during the robbery was registered to Baul. Given that information and the anonymous tip, Wolfe "set up a surveillance" of Baul's Long Beach residence. While Wolfe was considering attempting to obtain a

10

warrant to search Baul's home, "everything [seemed to] happen[] very fast." Within 45 minutes of the beginning of the surveillance of his home, Baul came outside, got into his car and drove off. At that point, Wolfe directed police officers to "pull over Baul."

Later, Wolfe had a conversation with Baul which led to the search of Baul's apartment. Wolfe told Baul he was looking for "any type of guns, any type of weapons [and] masks." After telling Wolfe he did not have any of those things and that Wolfe was free to search, Baul apparently filled out a form given to him by Wolfe. After the search of his residence, Baul was placed under arrest. At that time, Wolfe checked Baul's cell phone and reviewed the text messages he had sent and received.

At proceedings held on February 27, 2013, the trial court determined that, with regard to Jones, there was sufficient evidence "based on what [the police officers] heard from [Anderson's girlfriend]" regarding Shannon Jones, the "evidence of the cell phone coming back to the location [where] she lived," and evidence from other suspects which led to Jones, the only "female involved in [this] case," the trial court determined "there was sufficient probable cause to arrest Ms. Jones" at the time she was taken into custody and that "any fruits" found as a result of a search of Jones at that time would not be suppressed. Accordingly, as to Jones, the section 1538.5 motion was "denied . . . in its entirety."

On March 5, 2013, the trial court indicated that, although Jones's "exposure [in this matter was] over 40 years," the People had made an offer of 18 years. In spite of the offer, Jones then indicated she wished to relieve her counsel of record. The trial court dismissed all parties from the courtroom except Jones and her counsel and held a *Marsden*[5] hearing. Jones then indicated she did not believe her counsel was "rocking the boat on [her] case at all." Jones continued, "He's not doing anything . . . . He doesn't come to see me. We don't strategize. I mean, the probable cause on the case is weak . . . ." Finally, Jones indicated her counsel had told her he did not care about her case.

---

**5** *People v. Marsden* (1970) 2 Cal.3d 118.

11

In response, counsel stated he had been communicating with Jones about her case. With regard to her final comment, counsel indicated that before they had left the lockup, Jones had advised counsel that "it would be in [his] best interest to get off [her] case, and [he had] advised . . . her it didn't matter to [him] whether [he] stayed on the case or [he] worked the case, and [she was] making that . . . seem like [he did not] care about her" when, in fact, he cared about the case. Counsel then indicated that, "[a]s far as strategizing with her," they had met in the conference room one or two dozen times and each time they had talked about the evidence and the strategy to be used in the matter. As far as "rocking the boat," counsel indicated it was "just as fuzzy to [him] as it [was] to the court." Counsel stated he believed Jones wanted "some magic attorney to show up and wave a magic wand, get rid of her strike and all the wealth of evidence in this case."

Jones responded that, until her mother had contacted her counsel and told him to go speak with her, he had not come to C.R.D.F. to talk to Jones. According to Jones, counsel had "been wanting [her] to take the time from the time it was offered."

The trial court determined there had not been "any fundamental breakdown in communication" and that counsel had been doing an "adequate job of representing Ms. Jones." The court then concluded counsel would, at this point, continue to represent Jones. Jones then stated, "I'm not letting him represent me. I'm going pro per." The trial court immediately denied Jones's request, stating, "You're doing it [in] response to my denial of your *Marsden* [motion]. . . . [¶] I suspect you do not know [what the issues are]. You want to take that on, I'll hear it the next court date, if you want to think about [it]. This is an experienced defense attorney, tried many, many cases, knows exactly what he's doing. You want to take it on yourself, I'm telling you . . . that would be a huge mistake."

After the prosecutor and remaining defendants re-entered the courtroom, counsel for Jones indicated he had discussed the prosecution's offer, which had been reduced to 17 years, with Jones and she had indicated she needed more time to think about it.

After a recess was taken, Jones decided to enter a plea and take the People's offer of 17 years in prison. After Anderson entered a plea to three counts of robbery, the

12

prosecutor addressed Jones and stated: "You will also be pleading to . . . three counts of [robbery in violation of section] 211. In addition, you'll be admitting the personal use of a firearm pursuant to . . . section 12022.53[, subdivision] (b). [¶] In exchange for that plea, you'll be sentenced to 17 years in state prison." After Jones indicated she understood the terms of the plea and was waiving her right to a jury or court trial, her right to confront and cross-examine the witnesses against her, her right to use the subpoena power of the court to obtain witnesses in her defense, her right to testify in her own defense and her right to remain silent, also known as her right against self-incrimination, Jones pled no contest to three counts of second degree robbery in violation of section 211 and admitted that, during the offenses, she was personally armed with a firearm pursuant to section 12022.53, subdivision (b).

At the same proceedings, the trial court sentenced Jones to the high term of five years in prison for her conviction of robbery as alleged in count 1 of the information and 10 years pursuant to section 12022.53, subdivision (b) for her personal use of a firearm during the offense. In addition, and consecutive thereto, the court imposed one-third the mid-term, or one year, for Jones's conviction of robbery as alleged in count 2 and one-third the mid-term, or one year for the robbery alleged in count 3, for a total sentence of 17 years in state prison. The trial court then ordered Jones to pay a $280 restitution fine (§ 1202.4, subd. (b)), a stayed $280 parole revocation restitution fine (§ 1202.45), a $120 court operations assessment (§ 1465.8, subd. (a)(1)) and a $90 criminal conviction fee (Gov. Code, § 70373). Jones was awarded presentence custody credit for 272 days actually served and 40 days of conduct credit, for a total of 312 days. The trial court then dismissed counts 4, 5, 7 and 8 and recommended that Jones be placed in fire camp. Jones waived her appearance at the victim restitution hearing scheduled for April 8, 2013.

Jones filed a timely notice of appeal on April 29, 2013, based in part on the trial court's denial of her motion to suppress evidence. In addition, she contested the validity of her plea and asserted that her statements to police officers had been made under duress. For the latter two contentions, Jones requested a certificate of probable cause, which the trial court denied.

13

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed October 23, 2013, the clerk of this court advised Jones to submit within 30 days any contentions, grounds of appeal or arguments she wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.


We concur:


KLEIN, P. J.


CROSKEY, J.


14